## MILTON M. STONE *versus* CITY OF AUGUSTA.

Where one of the boundaries of land conveyed by a deed was, "thence to mill brook; thence by the *bank* of said brook to," &c., it was held, that the grantee's land is bounded by ordinary high water mark; and this principle is not changed by the fact, that the land continues to rise more or less precipitously above that point. His land is not limited to the top of the hill or bank beside the stream, but extends to the margin of the stream.

The Commissioners of the county of Kennebec so located a road as to cross a stream in the city of Augusta. The city made the road as laid out, and erected a bridge across the stream. An owner of land bounded by the stream, brought an action against the city for injury to his premises caused by the bridge, alleging that it was so constructed as to change the current of the stream whereby the damage occurred; — and *it was held*, that to establish the liability of the city, in this action, it was not necessary that the plaintiff should prove that the bridge was *wantonly* built so as to injure him; it was sufficient to show a want of ordinary care in the erection of the bridge, on the part of the officers of the city, and that thereby the injury happened, without any fault of plaintiff, arising from acts or negligence on his part, which contributed to produce the damage.

The laying out the way by the Commissioners was a judicial act; but the construction of it, and the erection of the bridge, were acts purely ministerial, and the same rules of law are to be applied to the city, as would be to individuals in the performance of acts of a like ministerial character.

And such a case is distinguishable from one of ordinary repair of a highway, falling within the jurisdiction of a highway surveyor.

EXCEPTIONS from the ruling of RICE, J.; and on MOTION of defendants to *to set aside the verdict*, as being against law and evidence.

This is an ACTION ON THE CASE, for diverting the water of Bond's brook, by the erection of a bridge, whereby damage was caused to the premises of the plaintiff.

The plaintiff read in evidence a deed of the premises from Thomas Fuller to himself, dated September 10, 1844, which are bounded thus: — "Beginning at the north line of lot No. 10, on the south side of the road leading to the grist-mill formerly owned by James Bridge, Esq.; thence southerly and easterly by said road, four rods; thence southerly and westerly, parallel with the north line of said lot No. 10, to the mill brook; thence by the bank of said brook to the north

line of said lot No. 10; thence east south-east to the bounds first mentioned, meaning hereby to convey to said Stone four rods off of the north-westerly end of the premises conveyed to me by Church Williams, by deed dated July 27, 1844." The description of the deed, Williams to Fuller, is thus:— "Beginning at the north line of No. 10, on the south of a road leading to the grist-mill formerly owned by James Bridge, Esq.; thence southerly and easterly by said road twelve rods and four links; thence southerly and westerly seven rods and eleven links to the bank of the mill brook, one rod below a great hemlock marked on the bank of said brook; thence by the bank of the brook to the north line of lot No. 10; thence E. S. E. to the bounds first mentioned, containing half acre, more or less."

It was admitted that the County Commissioners duly located the county road across Bond's brook, where the bridge was built, and that the defendants, in pursuance thereof, caused the bridge to be erected.

The testimony given at the trial was fully reported, (and is voluminous,) the nature and effect of the most material parts of it, are indicated in the arguments of the counsel.

The defendants' counsel requested the Court to instruct the jury as follows:—

1. That the plaintiff's deed bounds him by the bank of the stream, and that it does not give him the rights of a riparian proprietor, so as to maintain this action for damages growing out of the change of the current of the water.

2. If they find that the defendants made this bridge in the exercise of ordinary care, they are not liable to the plaintiff, although he may have suffered damages in consequence of its erection.

3. If they find that this road and bridge were legally laid out by the County Commissioners, and the defendants caused the bridge to be erected in pursuance of that laying out, they are not liable in this action, unless it was *wantonly* built, so as to injure the plaintiff.

4. If they find that the plaintiff was not in the exercise of

ordinary care in placing his buildings and wharfing on the bank as he did, and that his want of ordinary care contributed to produce the injury complained of, he cannot recover in this action.

5. If they find that there was a want of ordinary care on the part of defendants in the construction of the bridge, and that that contributed to the injury of plaintiff, but that at the same time other causes, also contributed to that injury, without which it would have happened, then this action cannot be maintained.

The first and third of said requests were refused. The second, fourth and fifth were given.

The verdict was for the plaintiff, for $500 damages.

*J. Baker*, for defendants, in support of the exceptions : —

I. The first requested instruction should have been given.

It is manifest by the descriptions in the two deeds, that, in law, the plaintiff is limited to the bank. 8 Maine, 85 ; 6 Mass. 435 ; 1 Pick. 180 ; 36 Maine, 309, and cases; 7 Mass. 496 ; Angell on Watercourses, pp. 3 and note, and 25, 26 ; 17 Mass. 289 ; 4 Hill, 369 ; 4 Mason, 365 ; 13 Maine, 198–201 ; 2 Bouvier's Law Dict. 485–7 and 646 ; 2 Bouvier's Inst. 176 ; 4 Mason, 400–3 ; 4 Kent's Com., 353–5. Then where, in fact, is the bank ? By the testimony, it appears that there is a clearly marked bank on the surface of the earth, and at some distance from the shore and current of the stream which is alleged to be changed. According to the testimony, in going from the road to the stream, we first have about fifteen feet of level ground; then we come to the brink of the steep bank, some judge it a descent of 45 degrees, but one witness took it exactly, and found it 39 ; and this bank must be about fifty feet in width horizontally; then we come to the shore nearly level, some eight feet wide, and finally to the water. By his deed, the plaintiff only owns *to* the bank, which is a term of exclusion ; so that he does not own the fifty feet of bank; he does not own the eight feet of shore; he does not own the land under the water to the thread of the stream.

He owns only the upland, some sixty feet from the stream, and has no more right to maintain an action for the diversion of the water, than if it was sixty rods from it. Not a particle of his land has been reached or disturbed by the action of the water.

This instruction was not only important, as it affected the very foundation of the action; but also:—

1. Because it affected the question how far the plaintiff's own negligence contributed to the injury. It would be stronger evidence of negligence to place his buildings on the bank of another, by trespass, than on his own.

2. Because it vitally affected the amount of damages. Only some ten feet of the main house stood on his own land, and the remainder of that, and all the other structures, were beyond his line, and all the damage was caused by the washing away what was beyond his line. These structures, placed on the land of another, not by consent, but by trespass, and fixed in the soil, became the property of the land owner, and the plaintiff had no right to recover for damage to them, and, much less, for damage to the soil, which the jury included in their verdict.

II. The third instruction requested should have been given. This is the only legal principle applicable to this class of cases; is distinctly recognized in *Hovey* v. *Mayo*, 43 Maine, 322; 23 Pick. 36 and 53.

III. The verdict is against law and evidence and ought to be set aside, because the bridge was built with ordinary care.

The Commissioners laid out the road in this precise location, and the case finds that the bridge was built in pursuance of it. The defendants had no discretion as to whether they would build it, or where they would build. They were compelled to build it just where it was built. The fact of building, and place of building, are not, therefore, involved in this inquiry. It is simply the manner of building, as affecting the current of the stream, and nothing else that is involved. Now, how was this done? It is proved, that the vent for the water is amply sufficient, 20 by 33½ feet. The arch bridge

below, where there is more water and more exposed to influx from the river, is only 36 feet in span.   The piers are laid parallel with the current, and so disturb it the least, and they do not project into the water more than usual.   The natural bed of the stream is only about 40 feet wide, and only 6½ is occupied by the piers.   Thus, we see, that the most deliberate consultation of scientific and practical men was held on the best mode of building this bridge, before it was built, and we have the judgments of all these judicious men since it was built, that it is built in the *most* prudent and skilful manner; in the manner that would least affect the current of the stream. There is no contradiction of this evidence.   Yet, in defiance of it all, the jury have found that it was not built with even *ordinary* care.   We complain that this finding is against the weight, the overwhelming weight of the evidence before them.

But, it will be said, that placing horizontal timbers at the bottom is evidence of want of care.   There are two ways of laying the foundation of such a bridge.   One is by driving piles into the ground, and the other is the one adopted in this case, by consultation.   These timbers are 16 inches thick and 40 feet long.   The earth was dug out at the edges of the channel for the ends of the timbers, and they were let into the ground, so that when the bridge came to be built, and ever since, their tops were below the natural bed of the stream, above and below them.   Now, as a matter of philosophy, it is impossible that these timbers, placed horizontally across the bed of the stream, at the bottom, could change the direction of the current to the right or left.   And, as a matter of fact, the witnesses testify that they actually do not change the direction of the current at all, or even obstruct the free passage of the water.

IV. The verdict is also against law and evidence, because it was clearly proved that other causes contributed to produce the plaintiff's injury.   43 Maine, 492.

1. His own negligence in building in such a place in the manner he did, and loading down thus a sandy soil on a clay bottom.

2. The back flowing from the river and from Gage's dam, built a short distance below this lot.

3. The breaking away of Bridge's dam in spring of 1854.

4. The extraordinary and unparalleled freshet of October, 1855.

We contend that there was proof that some or all of these not only contributed, but were the efficient causes of plaintiff's injury, and the jury should so have found, according to the instructions of the Court.

V. The verdict is against law for another reason, deserving of a distinct point. The writ sets forth no cause of action *"in hac vice."* It is true the writ does not allege, but the case finds, that the defendants built the bridge in pursuance of a legal location by the County Commissioners. Now on what principle of law can such an action be maintained? It is an action of *tort*, or *wrong*, and can only be grounded on some *unlawful acts. Spring* v. *Russell*, 7 Maine, 273 – 294 and 5. Oliver's Precedents, forms in case, 284 to 290.

The writ alleges no unlawful acts. The one act alleged is the erection of the bridge. It does not allege this to be unlawful, and the case finds that it was lawful. It does not allege that it was done in an *unlawful manner*, or that all the consequences, the diversion of the water and changing its current to the injury of the plaintiff, were not such as lawfully and necessarily flowed from the lawful act. Now the verdict only verifies the allegations in the writ. Therefore the jury have not found any *unlawful* act done by defendants, or any lawful act done in an *unlawful manner*.

Nor does the proof, independent of the writ, show any unlawful conduct on the part of the defendants.

The verdict is therefore against law and without proof, and ought to be set aside.

VI. The verdict is against law for another reason. The case finds that the defendants themselves did no acts. What was done, was done by Barrows, under the superintendence only, at the most, of certain city officers. Neither Barrows nor the city officers could be deemed, in law, the agents of

the city in doing any *unlawful* acts, nor could the city, in any way, be bound thereby. Angell on Highways, 196, cases in note.

VII. The damages are excessive.

*R. H. Vose, contra.*

The instructions of the Court were very favorable to the defendants. They assumed, that the defendants were duly authorized and obliged to erect the bridge in question; that if it was made in the exercise of ordinary care, they were not liable, and further, if they were not in the use of ordinary care, if the plaintiff was in the same position, or if there were other causes, in addition to the want of ordinary care on the part of the defendants, which contributed to the injury, then the defendants were not liable.

The subject of complaint is, first, that the Judge refused to instruct the jury, that, in order to entitle the plaintiff to recover, he must have the right of a riparian proprietor, which he had not, by a fair construction of his deed; and, secondly, that the plaintiff, in order to entitle himself to recover, must show that the bridge was wantonly erected.

Whether or not the plantiff was a riparian proprietor, it is not necessary to determine; his rights do not depend upon that question. Neither is it necessary to prove that the bridge was *wantonly* built so as to injure the plaintiff. The defendants are charged with no such thing; but simply in the common form, of negligence, are they charged; not wilfully nor wantonly, but of intending to do what they have done.

The right of the plaintiff to recover, in exact accordance with the instructions given, depends upon no new doctrine, but upon legal principles well established, both in this country and in England.

The first authority we cite, is from Angell on Highways, published in 1857, p. 196, § 221,—" When damages occur in the prosecution of a work, by order of a municipal corporation, the corporation is liable for the acts of its servants and agents, in the same manner as an individual. Municipal cor-

porations are charged with a twofold duty in regard to highways; first, they are to decide when, where, and what repairs and improvements are to be made in them, secondly, they are to procure them to be made. The former is a judicial, or legislative duty, in the discharge of which they are exempt from civil responsibility, so long as they do not exceed their jurisdiction. The *latter* is a purely ministerial duty, in the performance of which they derive no immunity from their character as a municipality, for any want of due care or diligence on the part of their agents. And, *where the injury was occasioned by an erection unskilfully constructed* upon the land of a city, and for its benefit, the city was held to be liable for the damages, although the persons who constructed the same were not its agents nor under its control." In accordance with this principle, was the decision, *the Mayor, &c., of New York, in error,* v. *Bailey,* 2 Denio's R. 433, — "A municipal corporation is responsible for the negligence or unskilfulness of its agents and servants, when employed in the construction of a work, for the benefit of the city or town subject to the government of such corporation." Again, " the degree of care, which a party who constructs a dam across a stream, is bound to use, is in proportion to the extent of the injury which will be likely to result to third persons, provided it shall prove insufficient. It is not enough, that the dam is sufficient to resist ordinary floods. *If the stream* is occasionally subject to great freshets, those must likewise be guarded against."

The defendants' counsel moved for a nonsuit, and one of the grounds was, that this action could not be sustained against the defendants, the work in question having been constructed by the water commissioners, appointed by the Governor and Senate, and not by or under the control of the defendants; and, again, that the defendants acted as public agents, in all that they had done in respect to the work in question, and, for that reason, were not responsible; and, moreover, that they were not a private corporation entrusted with the performance of the work in question." But all these

objections were overruled. See, also, *Bush* v. *Steinman*, 1 Bos. & Pul. 404.

These decisions are in accordance with the instructions given. But the courts have gone much further, and have decided that, although the work is legally authorized and carefully constructed, that still the defendants are liable for consequential damages. *Barron & Craig* v. *The Mayor and City Council of Baltimore*, reported in the American Jurist, No. 4, Oct., 1829. This was an action on the case, brought against the corporation of Baltimore for an injury done. to the wharf interest of the plaintiffs. The wrong complained of was the diversion of certain streams from their natural channel to a point near the wharf in question, to which point a large deposit of sand and earth was carried down by the streams, and thus lessened the depth of water at the wharf, and materially impaired its revenue and permanent value. That the work was legally authorized and carefully construct- ed was admitted.

The defendants asked the Court to instruct the jury that, if acting within the scope of their lawful authority, the jury should find that they acted *bona fide*, and to the best of their judgment, the action could not be maintained. But the Court refused, and instructed them, in substance, that the plaintiffs were entitled to damages, if they should find that by the diversion of the water, (though made with due circumspection and the best advice, and in consequence of cutting down and paving streets, for securing the health of the city and to pre- serve the navigation,) greater quantities of earth and sedi- ment were carried down by the diverted streams to the property of the plaintiffs, than were carried thither before the cutting down and paving. The verdict was for the plain- tiffs. The case was argued by some of the most distinguished attorneys in the country, and these principles were sustained, and the whole subject exhausted.

In the case of *Stevens* v. *Middlesex Canal*, 12 Mass. 466, the Court say, " if a work of public convenience and advan- tage should be constructed, the execution of which would

require or produce the destruction or diminution of private property, without at the same time affording the means of relief and indemnification, the owner of the property destroyed or injured would undoubtedly have his action at common law against those who should cause the injury, for his damages." Now, in the case at bar, the instructions of the Court proceed upon the ground that the defendants were in the exercise of a lawful right; — certainly the most favorable view for the defendants. But even this may well be doubted.

As to defendants' motion to set aside the verdict as against evidence.

Under the instructions of the presiding Judge, two facts were necessary to be established to the satisfaction of the jury : —

1st. That the plaintiff was damaged by the erection of the defendants' bridge.

2d. That it was owing to the fault of the defendants.

The point, that the damages assessed are excessive, and for that cause, the verdict should be set aside, was considered and controverted by counsel, citing *Jacobs* v. *Bangor,* 16 Maine, 187 ; *Brown* v. *Tyningham,* 12 Pick. 547.

The opinion of the Court was delivered by

RICE, J. — The case is presented on exceptions and report. Two grounds for exception were presented. First, that the Court erred in declining to instruct the jury, that the plaintiff's deed bounds him by the bank of the stream, and that it does not give him the rights of a riparian proprietor, so as to maintain this action for damages growing out of the change of the current of the water.

There will be found, on examination of the books, many technical rules by which to determine the effect of the descriptive terms of deeds, grants, &c., bounding lands upon rivers and other bodies of water. When, however, that sound and sensible principle of construction, that the intention of the parties must govern, is not overlooked in search of some more technical and recondite rule, there will, ordina-

rily be found little difficulty in arriving at satisfactory results. It is competent for a proprietor to convey such portion of his estate as he may desire, and affix such boundaries to the estate alienated as he may deem expedient, by the use of apt words for that purpose.

Thus the owner of upland and flats connected, may sell his upland without the flats, or the flats without the upland, or both together. It has, however, been held, under a technical rule of construction, originating in the Colonial Ordinance of 1641, that where land was bounded " on a stream, on the bank thereof, and on the bank of the Penobscot river," being tide water, the upland included in the description in the deed, not only passed, but the flats also, below high water mark, as appurtenant to the upland. *Lapish* v. *Bangor,* 8 Maine, 85. The same rule has prevailed in many other cases, both in this State and in Massachusetts.

The land, which is the subject of controversy in this case, lies upon the margin of a stream, in which, according to the testimony, the tide ebbs and flows, though the water is fresh. But this fact, according to the doctrine of the case above cited, is immaterial, the rule having reference rather to the question, whether the tide flows at the point in controversy, than to the fact that the water is salt or fresh.

If, then, the technical rule of the class of cases referred to were to be applied, the plaintiff's lot would not only extend to the bank of the brook, and include the upland, but would also include the flats, if any, below high water mark. This construction, however, is not applicable to the case and would not comport with the obvious intention of the parties. The plaintiff is bounded by the *bank* of the brook. By this term is understood what contains the river in its natural channel when there is the greatest flow of water. 1 Bouvier's Law Dict. The obvious intention was to include in the plaintiff's deed the land to the margin of the stream, but not to include the stream itself or the bed thereof. The owner may sell the land without the privilege of the stream; as he will, if he

bounds his grant by the bank.  *Hatch* v. *Dwight,* 17 Mass. 289.

The plaintiff's land is, therefore, bounded by ordinary high water mark, and this principle will not be changed by the fact that the land or bank continues to rise more or less precipitously above that point.  His land is not limited to the top of the hill or bank beside the stream, but extends to the margin of the stream, to that point where the bank comes in contact with the stream.

Such being the case, it is immaterial whether the plaintiff has the rights in the stream of an ordinary riparian proprietor or not.  He has the right to the quiet enjoyment of his land, to its full extent, and, if by any unauthorized diversion of the stream from its natural channel, he has been injured, he is entitled to a legal remedy for such injury.

The next alleged error, on the part of the presiding Judge, was, that he declined to instruct the jury that, if they find that this road and bridge were legally laid out by the County Commissioners, and the defendants caused the bridge to be erected in pursuance of that laying out, they are not liable in this action, unless it was wantonly built so as to injure the plaintiff.

There seems to have been no question raised at the trial, controverting the legal establishment of the way upon which the bridge was built, which is the alleged cause of the plaintiff's injury; nor that the bridge was constructed by the constituted authorities of the city, acting in their official capacity. The only question raised on this part of the case, has reference to the degree of care which the defendants were bound to use in the erection of the bridge.  The Court instructed the jury, that the defendants would be liable in damages for injuries sustained from want of ordinary care.  The defendants contended, that they would be liable only in case the bridge was wantonly built, so as to injure the plaintiff.

The laying out and establishing the way by the County Commissioners, was a judicial act, and was performed under

the same responsibilities as other acts of that character, which are judicial in their nature. But the construction of the way and the bridge thereon, by the city, through the intervention of its agents, were purely ministerial acts, and fall within an entirely different principle as to the degree of diligence required in the execution. In the latter case they, like private individuals, must proceed with ordinary care and diligence, and, if by the want of such care, private persons are injured, a remedy may be had for such injury by action at common law. Angell on Highways, § 221.

Under our statute, the duty is devolved upon highway surveyors, or road commissioners, to remove any obstacle, natural or artificial, which shall in anywise obstruct, or be likely to obstruct, or render dangerous the passage of any highway or town way. These officers are thus required to act, not only in a ministerial capacity, but also, to some extent, in a judicial capacity. They must not only remove obstructions, and make such repairs as are required to keep the ways under their jurisdiction, in such condition as to be safe and convenient, which is a merely ministerial duty, but they must determine, within certain limits, what repairs are necessary for the purpose, which determination partakes of a judicial character. And therefore, it has been decided, that if a highway surveyor dig down a street, or road, with discretion and not wantonly, no action at common law, under the general statute of the State, can be maintained against him. *Hovey* v. *Mayo,* 43 Maine, 322.

If the public safety, and convenience require a levelling of the road, the surveyor must do it with as much care in relation to property bordering on the road, as it is possible for him to use; and, if he should abuse his authority by digging down or raising up, when it might not be necessary for the reasonable repair and amendment of the road, he would be amenable to the suffering party for his damages. *Callender* v. *Marsh,* 1. Pick. 418.

Public officers, of every grade and description, may be impeached and indicted for official misconduct and corruption.

To this there is no exception, from the highest to the lowest. But the civil remedy, for misconduct in office, is more restricted, and depends exclusively upon the nature of the duty which has been violated. When that is absolute, certain and imperative, and every merely ministerial duty is so, the delinquent officer is bound to make full redress to every person who has suffered by such delinquency. Duties which are purely ministerial in their nature are sometimes cast upon officers whose chief functions are judicial. When this occurs and the ministerial duty is violated, the officer, although for most purposes a judge, is civilly responsible for his misconduct. *·Wilson* v. *Mayor, &c., of New York,* 1 Denio, 595.

The rights of the public in property are to be governed by the same rules of law as the rights of individuals, and the maxim *sic utere tuo ut alienum non laedas,* applies with equal force in the one case as in the other.

In the case under consideration, the laying out and establishing the way, was a judicial act, and was performed by the County Commissioners. The construction of that way, and the bridge thereon, was a purely ministerial act, and was devolved upon and performed by the city. It was not a case of ordinary repairs of a highway, falling within the jurisdiction of the road commissioners or highway surveyors, and for which they would be personally liable, but was performed by the agent of the city, acting under the supervision of the regularly constituted authorities of the city. For such acts the defendants are to be governed by the same rules of law as would private individuals, in the performance of acts of like ministerial character. The rule of law laid down by the presiding Judge, was applicable and appropriate for this class of cases, and not open to objection.

As to the motion. We have carefully examined the evidence reported, and though, if the case had been submitted to us for determination, upon the facts as therein presented, we might have come to a different conclusion, both upon the question of ordinary care and as to the amount of damages, yet we cannot say that the result is so manifestly incorrect as

to authorize us to interpose and set aside the judgment of the men to whom these questions were submitted, and whose duty it was to decide them.

No evidence has been adduced to show that the jury were influenced by prejudice and improper motives, and we do not think that there is such a preponderance of evidence as would authorize us to draw such an inference from the testimony in the case.

*Exceptions and motion overruled, and*
*Judgment on the verdict.*

TENNEY, C. J., and APPLETON, CUTTING, MAY, and GOODE-NOW, J. J., concurred.