## Steiner v. Fisher, Nessle et al.

*Equity — Non-navigable stream—Riparian rights—Rights of owners of land bounded by the high water-mark of non-navigable streams—Acquiring rights by prescription.*

1. Where land is bounded by the "high water-mark" on the bank of a non-navigable stream, the title of the owner does not extend to the middle of the stream, and he does not have riparian rights in such stream.

2. Such owners, by virtue of their deeds, have no right to fish, boat or bathe in the waters of the stream.

3. Although such persons, and those under whom they claim, have made such use of the waters for a period greater than twenty-one years, they acquire no rights by prescription, unless it be made to appear that such use was made or maintained against the consent of the owners, or that the right to do so was asserted or continued against the permission of the owners.

Bill for injunction. C. P. Lawrence Co., Sept. T., 1921, No. 4, in Equity.

On Aug. 26, 1921, the court dissolved the preliminary injunction and filed an opinion to sustain said action. In that opinion the court cited City of Patterson *v.* East Jersey Water Co., 70 Atl. Repr. 472; 40 Cyc., 559 and 565; Baylor *v.* Decker, 133 Pa. 168; Smoulter *v.* Boyd, 209 Pa. 146; Fuller *v.* Cole, 33 Pa. Superior Ct. 563; Diedrich *v.* N. W. Union Ry. Co., 42 Wis. 248, 24 Am. Reps. 399, and United Paper Board Co. *v.* Paper Co., 123 N. E. Repr. 200. However, after final hearing, the court filed the opinion dated May 21, 1923. Exceptions to said opinion having been filed, after argument of the same, the court filed the opinion dated Nov. 5, 1923, and made the injunction permanent.

*Wylie McCaslin* and *Harry K. Gregory,* for complainants.

*James A. Chambers* and *Aiken & Braham,* for defendants.

EMERY, P. J., May 21, 1923.—The Slippery Rock Creek is a non-navigable stream. Plaintiffs claim to own the land forming the bed of the stream at the place indicated in their bill, and seek to restrain defendants from entering upon the water on such land for the purpose of boating, bathing, fishing or any other purpose. The defendants own and lawfully occupy lands on the west side of the stream. They claim that the deeds under which they hold call for high water-mark on the west bank of the Slippery Rock Creek as their east boundary, and the stream being non-navigable, their title extends to the middle thread thereof, and that they have riparian rights in the stream. They defend on the ground that the bill seeks to restrain them from exercising their lawful rights in the waters of the stream.

Plaintiffs do not admit that the title of the defendants, by their deeds, extends to high water-mark on the west bank, but contend that, if it does, such title would not run to the middle thread of the stream and would convey no right to boat, bathe or fish in the waters of such stream, or to do any other act complained of in the bill.

### Findings of fact.

1. The lands involved were formerly part of a large tract, about 116 acres, conveyed by Enoch Dean to Daniel and John G. Kennedy, by deed dated April 12, 1856, and recorded in Deed Book A, page 58.

In 1858, by deed dated April 2nd, recorded in Deed Book A, page 524, J. G. Kennedy conveyed his undivided one-half interest in this tract to Andrew Fox; said tract is described as follows: "Beginning at the northwest corner, thence north 88 degrees east 147½ perches to a white oak, north of the corner; thence south 3½ degrees east 134 perches to a hemlock, southeast corner;

thence south 88 degrees west 147½ perches to a stone pile, southwest corner; thence north 3½ degrees west 134 perches to the place of beginning."

2. The Slippery Rock Creek runs through this tract from north to south. For many years a grist-mill and saw-mill were maintained and operated on the premises. The two mills were run by water-power and the place had long been known as "Kennedy's Mills."

3. While title was held by Daniel K. Kennedy and Andrew Fox, the land was divided into purparts, one parcel containing about twenty acres, of which the land of plaintiffs is a part, the other parcel containing about eighty acres, of which the land of defendants is a part.

4. From Daniel K. Kennedy and Andrew Fox plaintiffs derived title as follows: In 1863, by deed dated June 8th, recorded in Deed Book 10, page 11, Andrew Fox conveyed to Hosea Kennedy his undivided interest, and in 1865, by deed dated March 7th, recorded in Deed Book 11, page 517, Daniel K. Kennedy conveyed to Hosea Kennedy his undivided interest in a parcel containing about twenty acres, and described as follows: Beginning at the north line of the tract on the west bank of Slippery Rock Creek at high water-mark; thence by said north line to the northeast corner of the tract; thence south by the original line of tract to the southeast corner; thence westward by the south line of tract to the west bank of creek at high water-mark; thence by the course of said creek at high water-mark to a hemlock below mill; thence due west 7 perches to a large rock; thence north 26 degrees west 14 perches to a stone; thence north 55 degrees east 3½ perches to a head-gate at the head of the mill-race; thence along the west bank of creek at high water-mark to the place of beginning.

In 1874, the title of Hosea Kennedy to said parcel was sold by sheriff to Edward Mellon, deed dated Feb. 9th, recorded in Deed Book 65, page 171. This deed states improvements to be "farm dwelling, barn, grist-mill and saw-mill run by water-power." Edward Mellon devised his title to such parcel to Rebecca Mellon, his wife.

In 1893, by deed dated May 17th, recorded in Deed Book 65, page 173, Rebecca Mellon conveyed to Robert W. Mehard a small parcel, containing about 6 acres and 18 perches, described as follows: Beginning at a stone corner on line of lands of Harmony Oil and Mining Company; thence south 52½ degrees west 9.5 perches to lands of said company to a large rock; thence south 17 degrees east 8.5 perches; thence by same south 35½ degrees west 4.2 perches to the southeast corner of the public bridge; thence south 9 degrees west 11.5 perches by same to a hemlock tree; thence west 6.7 perches to a large rock; thence north 26 degrees west 14 perches to a stone; thence north 55 degrees east 3½ perches to a rock at where the old head-gate formerly existed; thence along the west or right bank of the Slippery Rock Creek at high water-mark as follows: North 22 degrees west 6 perches to a hickory tree; thence north 44 degrees west 4.3 perches to a service bush; thence north 59½ degrees west 10.8 perches to a maple tree; thence north 65 degrees west 28.4 perches to a large white oak tree; thence north 68 degrees west 14.6 perches; thence north 63½ degrees west 5.2 perches to a small hemlock; thence north 55 degrees west 11.6 perches; thence north 46 degrees west 8.4 perches to the donation-line of tract, and bounded on the said right bank by land of Robert Wylie; thence across said creek south 88 degrees east 23 perches to a white oak tree; thence south 58½ degrees east 14 perches; thence along east of the right bank of said creek by lands conveyed to Joseph McCaslin by deed of even date from this grantor; thence south 69 degrees east 7.3 perches to same; thence south 69 degrees east 70.4 perches by same;

4 D. & C.

thence south 67½ degrees east 28.7 perches by same; thence leaving the bank of said creek due east 13 perches to a stone; thence 65 feet south of the southeast corner of an existing stable on lands conveyed this day to Joseph McCaslin; thence south by said lands of McCaslin 7.7 perches to the place of beginning. Containing 6 acres 18 perches, more or less, and together, also, with all the land belonging to said grantor lying and being upon said Slippery Rock Creek and to high water-mark on either side immediately by said creek, i. e., to the northeast, and bounded on the right bank by land of John McCurdy and on the left bank by lands conveyed this day to Joseph E. McCaslin by the same grantor. And with all and singular the water rights or privileges as fully as the same are owned by said first party and held by her. The property aforesaid is what is known as the "Grist Mill property," and is part of (taken from west side) that certain tract of land which J. H. Cooper, Sheriff of Lawrence County, Pennsylvania, sold as the property of Hosea Kennedy to Edward Mellon.

In 1899, by deed dated May 25th, recorded in Deed Book 95, page 164, Robert W. Mehard conveyed the undivided one-third interest in said parcel of 6 acres and 18 perches to George E. Prather, who, in 1900, by deed dated Nov. 3rd, recorded in Deed Book 97, page 499, conveyed said undivided one-third to James A. Hogue.

In 1900, by deed dated Nov. 12th, recorded in Deed Book 97, page 496, Robert W. Mehard conveyed to said James A. Hogue his remaining undivided two-thirds interest in the said parcel of 6 acres and 18 perches.

In 1912, by deed dated Oct. 14th, recorded in Deed Book 163, page 297, James A. Hogue conveyed the same parcel of 6 acres and 18 perches to Gottleib A. Steiner, "together, also, with all the lands belonging to said grantor, lying and being in said creek and to high water-mark on either side immediately up said creek (into north and east), bounded on the right by lands of John McCurdy and on the left bank by lands of Eva McCandless, and with all and singular the water rights and privileges as fully as the same are owned by said first party and held by him, being the same property conveyed to grantor by Robert W. Mehard, two-thirds, and by George E. Prather, one-third."

Gottleib Steiner, deceased, by his will devised his estate to Nicholas J. Steiner and Grace E. Steiner, executors thereof, to be held by them in trust for period and purpose specified in the will.

5. From Daniel Kennedy and Andrew Fox defendants derived title as follows: In 1863, by deed dated June 11th, recorded in Deed Book 9, page 519, Daniel Kennedy conveyed to Andrew Fox his undivided interest in a parcel containing about 80 acres, and described as follows: Beginning at the southwest corner; thence north 1 degree west, by land of Kildoo's heirs, 135 perches to a post on the north line of the tract; thence north 88 degrees east by land of Robert White to the west bank of Slippery Rock Creek at high water-mark; thence by the course of said creek at high water-mark to the west side of head-gate at the mill-dam; thence south 55 degrees west 3½ perches to a stone; thence south 26 degrees east 14 perches to a large rock; thence due west 7 perches to a hemlock on the bank of creek at high water-mark; thence southwardly by the course of said creek at high water-mark to the south line of tract; thence south 88 degrees west by land of Thomas Young to the place of beginning.

In 1873, by deed dated April 16th, recorded in Deed Book 24, page 252, Andrew Fox conveyed to Edwin Forbes the following parcel: "Beginning at corner of land of Rebecca Forbes; thence north 1 degree west 7 perches to a

post; thence south 89 degrees west 22 perches to a post in the centre of the road; thence by centre of said road north 1 degree west 48½ perches to a post; thence north 89 degrees east 25 perches to a post at creek; thence along said creek 88 perches to a rock; thence south 40 degrees west 4 perches to a post; thence south 25 degrees east 2 perches to centre of road; thence north 31 degrees west 21 perches to a stump in road; thence along centre of said road south 78 degrees west 53 perches to the place of beginning. Containing about 20 acres, more or less, being part of large tract conveyed to said grantor by Daniel Kennedy by deed dated June 11, 1860, recorded in Deed Book 9, page 519, and by John Kennedy by deed dated April 2, 1858, recorded in Deed Book A, page 524."

In 1875, by deed dated March 8th, recorded in Deed Book 26, page 150, Edwin Forbes conveyed to Robert Wylie the same parcel. By last will of Robert Wylie, probated before the Register of Wills of Lawrence County, in Will Book 5, page 513, the testator devised the said parcel to his widow, Martha Wylie, and his three children, Martha Forbes, Sarah Ann Stoner and Della Currie.

In 1904, by deed dated Aug. 24th, recorded in Deed Book 123, page 19, Martha Wylie, Martha Forbes, Sarah Ann Stoner and Della Currie conveyed to I. Walker Book, and the said I. Walker Book conveyed a portion thereof to Frank S. Nessle by deed dated Jan. 10, 1916, recorded in Deed Book vol. 182, page 454, as follows: Beginning at the southwest corner thereof at an iron stake near the side of the public road; thence by land of grantors north 41 degrees east 180.3 feet to an iron stake on line of lands of G. A. Steiner, said stake being near the right bank of Slippery Rock Creek; thence by said creek to line of lands of G. A. Steiner south 61½ degrees east 84 feet to a service tree on the right bank of said creek; thence by same south 46 degrees east 72.1 feet to a small hickory tree on the right bank of said creek; thence by same south 24 degrees east 90 feet to a rock near the former location of old head-gate; thence, leaving the bank of said creek line to line of lands of said G. A. Steiner, south 53 degrees west 57.7 feet to an iron stake near the north side of said public road; thence by north side of said public road to line of grantor north 1 degree 9 minutes west 251.6 feet to the place of beginning. Containing three-fourths of an acre, more or less.

6. The boundary or division-line between the lands of plaintiffs and the lands of defendants is the west bank of Slippery Rock Creek "at high water-mark, a non-navigable stream."

7. The plaintiffs, Nicholas J. Steiner and Grace E. Steiner, are trustees of estate of Gottleib A. Steiner, deceased, by terms of his will.

### Discussion.

In the title of plaintiffs, the deed from James A. Hogue to Gottleib A. Steiner, the west boundary or division-line between lands of plaintiffs and lands of defendants is located and described by reference to the marks on the ground. It is argued from this that the west boundary of line of land of plaintiffs is at the location of the marks referred to in such deed. This contention might be sustained if the marks referred to in the deed were on the land of Hogue; that is, were not as far west as high water-mark. Hogue could convey less land than he owned, but he could not convey more than he owned. It is clear that the purpose of this deed was to convey the title of Hogue to Steiner, and Hogue's west boundary was the west bank at "high water-mark."

The intention of the parties to the deeds in this case is to be gathered, not alone from the words of the instrument, but from such words, circumstances

4 D. & C.

and conditions in which they were used to express their intention.  In thus reading the conveyances, it is apparent that plaintiffs' predecessors in title intended to protect the land lying between high water-mark on the east side of the west bank by specifying such high water-mark as the dividing-line, the actual boundary of the land conveyed to others.

We must not lose sight of the fact that the undisputed right to use water-power unmolested was the controlling thought in the minds of plaintiffs' predecessors in title.  The value of the mill property consisted, not of the mill-site alone, but of its ownership and the right to maintain the dam and dam up the water for water-power purposes.  The land necessary and essential to the ordinary use of the mill-site and water-power included the land lying between high water-mark on each bank for the storage of water.  The owners of the larger tract, having the water-power privilege, so conveyed lands to preserve the water-power privilege.

In the light of the situation and the use of the property, and the relation of the parties to such condition and use, it is evident the parties intended that the designation of "high water-mark" on the west bank as a boundary should limit the grantee to such line as conclusively as though the designation of such line had been by reference to marks or monuments on the ground.  Some of the parties named as defendants, no doubt, purchased and improved their lands under the impression they would have the right to enjoy and use the water of the stream.  But it seems quite clear, upon reading the several deeds and comparing the descriptions in them, that they have no such privilege, but that their rights cease at "high water-mark" on the west bank.

Counsel have cited a number of cases; none of them, however, is decisive of the rights of the parties under facts and circumstances similar to these in this case.  The common law rule is well stated by the Supreme Court of the United States in Howard v. Ingersoll, 54 U. S. 381; 14 Law Ed., 189: "Grants of land, bounded by the sea or by navigable rivers, where the tide ebbs and flows, extend to high water-mark; that is, to the margin of the periodical flow of the tide, unaffected by extraordinary causes, and the shores below common high water-mark belong to the state in which they are situated.  But grants of land bounded on rivers above tide-water, or where the tide does not ebb and flow, carry the grantee to the middle of the river, unless there are expressions in the terms of the grant, or something in the terms, taken in connection with the situation and the condition of the lands granted, that clearly indicate an intention to stop at the edge or margin of the river.  There must be reservation or restriction, expressed or necessarily implied, which controls the operation of the general presumption and makes the particular grant an exception.  These are familiar principles of universal application governing the construction of grants of land bounded upon the sea or tide-water, or upon fresh-water rivers, navigable or unnavigable, and whether made by states or individuals, or in large or small tracts. . . .

"Where land adjoining a fresh-water river, or above tide-water, is described as bounded by a monument, whether natural or artificial, such as a tree or stake standing on the bank, and a course is given as running through it, up or down the river, to another monument standing upon the bank, these words necessarily imply, as a general rule, that the line is to follow the river according to its meanderings and turnings, and the grantee takes to the middle of the river.  Such is the uniform construction given to this description where the common law prevails."

But the rule of the common law has not been wholly accepted in this State: Shively v. Bowlby, 152 U. S. 1; 38 Law Ed., 331-343.  To the same effect are

Carson c. Blazer, 2 Binn. 474; Johns v. Davidson, 16 Pa. 512; Bigler v. Antes, 21 Pa. 288; Flanagan v. Philadelphia, 42 Pa. 219.

The recognized rule in this State is that where a deed calls for a stream as a boundary, the grantee will take to the middle thread, if it be a non-navigable stream, and to low water-mark, if it be a navigable stream. This is presumed to have been the intention of the parties. In Wood v. Appal, 63 Pa. 210, &c., the opinion contains a review of many cases.

In the deeds under which defendants claim there is no call for the Slippery Rock Creek as a boundary by any grantor who owned the land east of high water-mark. To cut out of the large tract the 20-acre piece embracing the mill-site and land lying on the east side of the stream, and begin the description by starting "on the west bank of Slippery Rock Creek at high water-mark," thence across the creek, affords sufficient evidence that the grantors in such deed were to have, in connection with the mill and water-power, the ownership of the land on which the stream flowed, beginning on the west bank "at high water-mark."

The defendants have acquired no rights by prescription: Tinicum Fishing Club Co. v. Carter, 61 Pa. 21.

If the deeds under which defendants claim title convey title to the middle of the stream, as now contended, their predecessors would have held the same interest in the water-power afforded by the stream as that held by the predecessors in title of plaintiffs. The parties, when the conveyances were new, appear to have accepted them as vesting no such right in the predecessors in title of defendants. (See note, Sharswood, Black., Book 2, page 18.)

### Conclusions of law.

1. The title represented by the plaintiffs includes the land forming the bed of Slippery Rock Creek, and expressly extends from high water-mark on the west bank across the stream, thereby vesting in the owner the exclusive right to fish, boat and bathe in the water of such stream on their land.

2. The east boundary-line of land of defendants is at "high water-mark on the west bank," it does not approach or extend to the middle thread of the stream, and the owners do not have riparian rights in such stream.

3. The defendants have no right by their deeds to fish, boat or bathe in the waters of Slippery Rock Creek on the land of the plaintiffs.

4. The defendants have no rights as riparian owners to fish, boat or bathe in the waters of Slippery Rock Creek on the land of plaintiffs without the consent of the owners so to do.

5. The defendants have no right by prescription to use the land forming the bed of the stream or to the use of the water flowing thereon.

6. The plaintiffs have standing, under the will of Gottleib A. Steiner, to maintain this bill and to restrain defendants from fishing, boating or bathing in the waters of the Slippery Rock Creek on the land owned by Gottleib A. Steiner at his decease.

Counsel will prepare a decree in accordance with this opinion and submit the same.

Opinion filed on dismissing exceptions.

EMERY, P. J., Nov. 5, 1923.—The plaintiffs, as executors and trustees under the will of Gottleib A. Steiner, deceased, allege in their bill that the testator died seized of a certain parcel of land in Slippery Rock Township, bounded north by land of John McCurdy, east by land of Mrs. McCandless, south by land of McCormick heirs, west by land of I. N. Book, and containing six acres, more or less; that a large portion of said land is covered by the waters of the

Steiner *v.* Fisher, Nessle et al.

Slippery Rock Creek; a dam is erected across the stream on their land, and has been so maintained for many years; that printed notices had been posted for a period of two years or more in conspicuous places on said premises, warning persons against trespassing thereon, and that the defendants and invited guests and friends frequently entered on said premises for the purpose of boating and fishing, and that a floating dock and spring-board are maintained on the west side of said stream and used by the defendants, their guests and friends, in boating and bathing in the waters of plaintiffs.

The defendants in their answer admit the material allegations of fact in the bill, and aver as defence that the land lying on the west side of the Slippery Rock Creek, referred to in the bill, is owned and occupied by certain of the defendants; that the west line of the land of plaintiffs is high water-mark on the west bank of said stream, and that said high water-mark is also the easterly boundary-line of land occupied by the defendants; that certain of the defendants, as owners of the land extending to such high water-mark, have riparian rights in such stream, and that they and the other defendants, as their guests and friends, have the right to boat, bathe and fish in said water as charged in the bill, and that the defendants were not trespassers, but have the right to bathe, boat and fish in said water and do any and all things which riparian owners might lawfully do in such stream.

The evidence at the hearing clearly indicated that the land of plaintiffs extended from the east side across the stream to the bank on the west side at high water-mark, and that the land occupied by the defendants extended towards such stream to the same high water-mark. It was evident from the deeds that the parties had fixed high water-mark on the west bank of the stream as the boundary-line, and not the stream itself; that an opinion was filed holding that the title of defendants, extending only to high water-mark, gave them no rights in the stream as riparian owners. To this opinion numerous exceptions have been filed, the same have been fully argued, and this opinion is filed thereon.

From the evidence the following material facts are found:

1. The land of plaintiffs and the land of defendants were formerly parts of a larger tract through which the Slippery Rock Creek flows.

2. This large tract of land was divided by Daniel Kennedy and Andrew Fox, predecessors in title, about 20 acres on the easterly side being conveyed to Hosea Kennedy by deed dated June 8, 1863. The boundary-line between the two parcels is described as follows: "Thence westward by the south line of tract to the west bank of creek at high water-mark; thence by the course of said creek at high water-mark to a hemlock below mill; thence due west 7 perches to a large rock; thence north 26 degrees west 14 perches to a stone; thence north 55 degrees east 3½ perches to the head-gate at the head of the mill-race; thence along the west bank of creek at high water-mark to the place of beginning."

3. By subsequent conveyances, Gottleib A. Steiner became seized of six acres of this parcel, the westerly boundary-line being the same. It is on this land that the bill claims the defendants trespassed; that is, upon the water on this land.

4. The land occupied by defendants is part of the westerly parcel of such large tract. The description of the easterly boundary-line corresponds with the description of the westerly boundary-line of the land of plaintiffs. In deed of Daniel Kennedy to Andrew Fox, dated June 11, 1863, for such parcel, the location of the easterly line is described as follows: "Thence north 88 degrees east by land of Robert White to the west bank of Slippery Rock

Creek at high water-mark; thence by the course of said creek at high water-mark to the west side of head-gate at the mill-dam; thence south 55 degrees west 3½ perches to a stone; thence south 26 degrees east 14 perches to a large rock; thence due west 7 perches to a hemlock on the bank of the creek at high water-mark; thence southwardly by the course of said creek at high water-mark to the south line of tract." The defendants contend that the owners of land up to this line are entitled to enjoy the rights of riparian owners in the waters of the Slippery Rock Creek.

5. For many years persons have been accustomed to fish and bathe in the waters of this stream, both above and below the dam. Many persons visited the place and season after season fished and bathed in the waters, and at infrequent intervals would row boats on the water. This practice, as in similar waters generally, has been continued for thirty years or more. There was no special place to enter the water or to leave it, but the practice was to use the stream for such purposes, both above and below the dam, without discrimination as to the place of entry upon the water or exit from it. Such persons sometimes obtained the consent of the owner, predecessors in title of plaintiffs. It does not appear, however, that such use of the waters was made or maintained against the consent of the owner at the time or that any right to boat, bathe or fish in the stream was asserted or continued against the permission of the owner of the fee.

6. Slippery Rock Creek is a non-navigable stream.

### *Discussion.*

If A owned a piece of land extending from east to west across a non-navigable stream and conveyed to B the land on the east side and extending across such stream to high water-mark on the west bank, and then conveyed to C the land lying still west of such high water-mark, it would appear that the parties had adequately, if not positively, expressed an intention to make such high water-mark the dividing line between land of B and C. It will be conceded that parties may lawfully establish such line as the division or boundary between the different grants. If the indentures here disclose such lawful intention and purpose, the courts are as clearly bound to observe such intention and purpose as the parties themselves and their successors in title thereunder.

It is difficult to see what language could have been used to more explicitly and definitely declare an intention to make the location of high water-mark on the west bank of this stream the limit, to the west, of the land of plaintiffs, and the limit, to the east, of the lands of defendants. The location of such line is not uncertain; it is fixed and established. The words are not doubtful in meaning, and there is no conflict or contradiction in the description. If it were the intention and purpose of the parties, when the larger parcel was divided, to fix such line as the boundary between the parcels, then either party can have no interest or concern in what lies on the opposite side of such boundary, whether water or land.

In Fuller *v.* Cole, 33 Pa. Superior Ct. 563, the division-line was "from a corner in the edge of Wall Pond; thence along edge of said pond south 57 degrees east 31 perches to a corner in the edge of said pond; thence south 18 perches to a hemlock tree." Of this the court say (pages 567-8): "Had this boundary-line been a stone wall six feet in width at the bottom, the grant would have extended to the centre of it, as was said in Warner *v.* Southworth, 6 Conn. Reps. 471, but it could go no further than the centre of the boundary-line. The line as described, not the pond, was his boundary, and beyond it he

Steiner v. Fisher, Nessle et al.

had no right to go, whether to take ice, mine coal or cut timber, or whether it was arable land or a lake. In crossing this line he became a trespasser. Even in cases where a river is mentioned as a boundary, where the language used clearly shows such to be the intention of the grantor, the bank, side, margin or shore become themselves monuments, and are to be treated as such, and such grant does not extend to the centre of the stream unless there are in the deed other words indicating that such were the grantor's intention: Angel on Water Courses, § 26, and cases cited."

In City of Boston v. Richardson, 95 Mass. 146, the rule is stated to be as follows: "Whenever land is described as bounded by other land, or by a building or a structure, the name of which, according to its legal and ordinary meaning, includes the title in the land of which it has been a part, as a house, a mill, a wharf, or the like, the side of the land or structure referred to as a boundary is the limit of the grant; but when the boundary-line is simply by an object, whether natural or artificial, the name of which is used in ordinary speech as defining a boundary, and not as describing a title in fee, and which does not in its description or nature include the earth as far down as the grantor owns, and yet it has width, as in the case of a lake, river, a ditch, a wall, a fence, a tree, or a stake and stones, then the centre of the thing so running over or standing on the land is the boundary of the lot granted."

Fuller v. Cole, 33 Pa. Superior Ct. 563, went up from Lackawanna County. Later, another case, Fuller v. Fisk et al., in reference to the same lake or pond, was heard before the Court of Common Pleas, involving practically the same question as is reported in 8 Lacka. Jurist, 273.

"A presumption of knowledge and acquiescence of the owner that the exercise is under a claim of right is required in cases of prescription." (Syllabus.) Tinicum Fishing Co. v. Carter, 61 Pa. 21.

"When the evidence which the claimant produces in support of his alleged right to an easement fully explains the manner in which the enjoyment began and is not sufficient to warrant a finding that the owner knew, or ought to have known, that the use was under a claim of right, the presumption of a grant does not arise:" Garrett v. Jackson, 20 Pa. 331; Foulk v. Brown, 2 Watts, 209; Carter v. Tinicum Fishing Co., 77 Pa. 310.

"An annual entry on another man's land to cut timber, feed cattle, hunt or fish, with the cultivation of a truck patch in the summer, as incidental to other pursuits, can never give title:" Baylor v. Decker, 133 Pa. 168; Gibbs v. Sweet, 20 Pa. Superior Ct. 275-285.

"Such a right must not only have been enjoyed continuously for twenty-one years, but such use must have been adverse to the rights of the owner of the land in order to give title:" Okeson v. Patterson, 29 Pa. 22; Bennett v. Biddle, 140 Pa. 396.

### Conclusions of law.

1. The defendants did not acquire the right to boat, bathe or fish or other right in the waters of the Slippery Rock Creek as riparian owners by their deeds of land lying west of high water-mark on the west bank of such creek.

2. The defendants have not acquired the right to bathe, boat or fish in the waters of the Slippery Rock Creek by prescription or use as against the plaintiffs as owners of the fee.

3. The plaintiffs are entitled to an injunction restraining the defendants from bathing, boating, fishing or otherwise trespassing on the land described in the deed to Gottleib A. Steiner, deceased, and from trespassing upon said lands.

4. The defendants have no right to bathe, boat or fish or any other right as riparian owners in the lands of which Gottleib A. Steiner died seized, lying east of high water-mark on the west bank of the Slippery Rock Creek, and the plaintiffs have standing to maintain this bill.

Solicitor for plaintiffs will prepare form of final decree, with notice to solicitors for defendants, and submit same to the court as provided in Equity Rule 84.

From William McElwee, Jr., New Castle, Pa.